UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE | CASE NO. 04-10703 |
| **ROBERT ARLIN BROWN** | |
| *Debtor* | Section "B" CHAPTER 7 |
| **CLAUDE C. LIGHTFOOT, JR.,** | |
| *Plaintiff* | |
| **VERSUS** | ADVERSARY NO. 04-1065 |
| **JON M. HUFFMAN** | |
| *Defendant* | |

*administratively consolidated with*

| | |
|---|---|
| IN RE | CASE NO. 04-10706 |
| **WILLIAM ROBERT MEMMOTT** | |
| *Debtor* CHAPTER 7 | Section "B" |
| **CLAUDE C. LIGHTFOOT, JR.,** | |
| *Plaintiff* | |
| **VERSUS** | ADVERSARY NO. 04-1066 |
| **JON M. HUFFMAN** | |
| *Defendant* | |
| IN RE | CASE NO. 04-10709 |
| **KEVIN JOHN ALLISON** | |
| *Debtor* | Section "B" CHAPTER 7 |
| **BARBARA RIVERA FULTON.,** | |
| *Plaintiff* | |
| **VERSUS** | ADVERSARY NO.04-1067 |
| **JON M. HUFFMAN** | |
| *Defendant* | |

-1-

**MEMORANDUM OPINION**

This matter came on for trial on October 4, 2004 on the complaints of Claude C. Lightfoot, Trustee and Barbara Rivera-Fulton, Trustee (hereinafter collectively referred to as the "trustees") to recover estate property under 11 USC §§ 541, 544, 548 and Louisiana Civil Code 2036, *et seq*. and objections to the proofs of claim filed by Jon M. Huffman ("Huffman"). The defendant, Huffman, has answered each complaint with a general denial, pleaded several affirmative defenses and contends that the estate owes him $47,817.59. The adversary proceedings were consolidated by order of April 6, 2004.

For the reasons stated below, the court will enter a judgment for the trustees and against Mr. Huffman in the amount of $93,809.29, and disallow the claims filed by Mr. Huffman in each of the above-captioned bankruptcy proceedings.

**I.      Background**

On February 4, 2004, Robert Arlin Brown, William Robert Memmott, and Kevin John Allison (hereinafter the debtors) each filed for Chapter 7 bankruptcy after they were unable to meet their obligations under a bond for deed contract to acquire a bed and breakfast owned by Huffman.

Initially, the debtors intended to buy the property outright for $700,000, but were unable to obtain the requisite funding. The lack of funding combined with a

"due on sale" clause in the mortgage encumbering the property lead the parties to enter into a bond for deed contract, executed on or about July 10, 2003. The contract provided that the debtors would 1) offer a down payment of $140,000,[1] 2) pay $5,679.89 per month for approximately three years to Escrow Services, Inc.[2] (hereinafter the "escrow agent"), and 3) pay a balloon payment of $497,161.73 or the amount remaining on the balance as of September 1, 2006. The contract stated that upon the debtors' default, Huffman had the right to cancel the contract and repossess the property after providing notice of such intent 45 days in advance. Default was defined in the contract as non-payment of insurance, taxes, or the monies owed to the escrow agent.

To fix portions of the property that were damaged, Huffman gave the debtors a $4,000 repair credit.[3] In addition, Huffman advanced $5,576 of prepaid room rentals to the debtors so that they could honor reservations at this New Orleans bed and breakfast. The parties have stipulated that after deduction of costs of sale paid by the defendant, Huffman received a total of $105,886.48 in cash at the closing.[4]

During the period in which the debtors adhered to the terms of the contract they paid sums to satisfy the insurance bill for the property. These sums totaled $5,797.10 for the insurance coverage.

---

[1] The debtors eventually made a total down payment of $147,140.37
[2] Escrow Services, Inc. then paid these monies to the mortgagee, Omni Bank, in order to keep payments on the mortgage current.
[3] Exhibit 4.
[4] Pl. 13, Pretrial Order. The buyer paid settlement charges of $9,246.50. Exhibit 4.

Huffman paid taxes, insurance, and the mortgage on the property, even though these were contractual obligations of the debtors, both before and after the debtors' default. These payments amounted to $1,635.60 for insurance, $11,510 for the mortgage, and $12,026.48 for the property taxes. The total of these payments was $25,172.01.

The debtors made two payments to the escrow agent in August and November 2003, totaling $11,409.78, and then defaulted on the two payments falling due in December 2003 and January 2004. In a letter dated December 15, 2003, the escrow agent informed the debtors of Huffman's intention to cancel the contract and repossess the property if the debtors did not cure the default within 45 days. Because the debtors were unable to cure their default, Huffman filed a Cancellation of Bond for Deed and Special Mortgage in the public records on February 3, 2004. The debtors filed for Chapter 7 relief on February 3, 2004 and did not vacate the property until they were evicted on March 17, 2004, after the automatic stay was lifted.

When Huffman re-entered the property, he found damage caused by the debtors. According to Huffman the debtors allowed certain portions of the property to rot, removed sections of the weather board, cut a hole in the ceiling of the rear stair case, and broke the controls to a spa. Huffman spent $1,938.66 to

repair the damage in order to return the property to its former state. In addition, Huffman claims that the debtors purloined $11,385.10[5] of prepaid room receipts.

Huffman eventually re-sold the property to Philip Lege and David Smith for $650,000. This price is a $50,000 less than the $700,000 initially agreed upon by Huffman and the debtors.

The trustee asserts that, under the Louisiana jurisprudence governing bond for deed contracts, Huffman is liable for the return of all moneys paid by the debtor under the Bond for Deed, subject to a credit for the reasonable rental value of the property. Alternatively, the trustee asserts that the sums paid by the debtor to Huffman are subject to avoidance under §544 or as a fraudulent conveyance under §548 and/or Louisiana Code art. 2036. The trustee additionally asserts that the proofs of claim filed by Huffman in the bankruptcy cases should be disallowed in their entirety.[6]

Huffman's answer contains a general denial and several affirmative defenses, including that, under Louisiana law, he is entitled to retain all funds received by him at the closing of the Bond for Deed, that the trustees are not entitled to recover funds paid by third parties for the properties, and that he is entitled to an offset or to recoup lost profits, lost revenues, lost income, lost sales

---

[5] Huffman's pretrial memorandum places this figure at $11,385.10, his post-trial memorandum states that it is in an amount in excess of $13,000. Pl. 15.

[6] Huffman filed two proofs of claim in each bankruptcy case: 1) a secured claim for $560,000 and 2) a secured claim in an unspecified amount for the "return of furnishings and fixtures."

opportunity, real estate commissions, note payments, rental income and the fair rental value of the property.

**II. Law and Analysis**

The parties stipulated that the debtors paid a total of $164,061.75 towards the bond for deed contract, including the down payment, mortgage and insurance.[7] In addition, the parties have stipulated to both a fair market rental value of $35,000[8] and $1,938.66 in repair costs for damage to the property during the debtors' occupancy. The rental value and the costs of the repairs were deducted from the total amount paid by the debtors in the bond for deed contract leaving $127,123.09 in contention.

Huffman argues that the debtors' estate owes him at least $8,081, after liability to the plaintiffs is reduced by his damages.[9] He arrived at this number by deducting claims for lost profit, recoupment, and reimbursement for the tax, mortgage, and insurance payments from the $164,061.75 the parties have stipulated they initially paid for the property, as follows:

---

[7] This amount is comprised of the following: $147,140.37 paid at closing, $11,409.78 in mortgage payments made by the debtors and $5,797.10 paid by the debtors for property insurance.
[8] The $35,000 does not cover the period between the cancellation of the bond for deed contract on February 3, 2004 and the debtors eviction on March 17, 2004
[9] Pl. 15. Initially, in his pre-trial memorandum, Huffman asserted that he was due at least $47,817.59 on his proof of claim, after all liability to the plaintiffs is reduced by recoupment for his damages. Pl. 16, pg. 17.

| Huffman's Claim | Amount | Amount of the trustee's claim ($164,061.75 stipulated paid value) |
|---|---|---|
| Fair Rental Value (Stipulated) | $35,000 | $129, 061.09 |
| Property Damage (Stipulated) | $1,938.66 | $127,123.09 |
| Fair Rental Value post petition | $8,649.45 | $118,473.64 |
| Lost Profit | $50,000 | $ 68,473.64 |
| Second Sale Transaction Costs | $28,807 | $ 39,666.64 |
| Prepaid Room Deposits Recoupment | $18,576 | $ 21,090.64 |
| Repair Credit | $4,000 | $ 17,090.64 |
| Taxes, Insurance and Mortgage | $25,172 | ($ 8,081.36) due Huffman |

The trustee asserts that he is due $127,123.09 by Huffman. This figure is composed of the total sums that the debtors paid under the bond for deed contract less the fair rental value for the property and the cost of repairs. In response to Huffman's assertions regarding the lost profit claim, the trustee argues that this is not an appropriate form of compensation for a breached bond for deed contract. Instead, the trustee asks that the court allow only the fair rental value and the repair costs to Huffman as recompense for the debtors' breaches. Additionally, the trustee argues that the repair credit claim is invalid because Huffman never actually paid this sum to the debtors. Finally, the trustee contends that the recoupment claims pleaded by Huffman are unrecoverable.

The parties' disagreement can be trifurcated into 1) remedies for the debtor's breach of the bond for deed contract, 2) availability of recoupment for the prepaid room deposits, and 3) amount of rent attributable to the time between the debtors'

bankruptcy petitions and their eviction from the property.

## 1. Remedies for Breach of a Bond for Deed Contract

The bond for deed contract is the Louisiana version of the common law conditional sale.[10] Louisiana law defines the bond for deed contract as "… a contract to sell real property, in which the purchase price is to be paid by the buyer in installments and in which the seller after payment of a stipulated sum agrees to deliver title to the buyer."[11] There is little jurisprudence in Louisiana on the appropriate measure of damages to a seller when a bond for deed contract is breached. Case law provides that after the breach of the bond for deed contract, the buyer may recover all monies paid for the property, including the down payment, mortgage payments, insurance premiums, and taxes.[12] The seller may recover the reasonable rent from the defaulting buyer for his use of the property during occupancy.[13]

A bond for deed contract is a contract to sell immovable property, not a sale or lease of such property.[14] Therefore, the damages available for breach of contract

---

[10] *See* Huey L. Golden, *Comment: The Conditional Sale in Louisiana Jurisprudence: Anatomy of a Synecdoche* 54 La. L. Rev. 359, 363 (1993).
[11] La. R.S. 9:2941 (1997).
[12] *Scott v. Apgar,* 113 So. 2d 457, 461 (La 1959); *Seals v. Sumrall*, 887 So.2d 91, 96 (La. App. 1st Cir. 2004); *Berthelot v. Le Investment, LLC,* 866 So.2d 877, 881-82 (La. App. 4th Cir. 2004); *Gray v. James, 503 So.2d 598,* 601 (La. Ct. App. 1st Cir. 1987).
[13] *Gray ,* 503 So. at 602.
[14] *See Cosey v. Cosey*, 364 So.2d 186, 187 (La. Ct. App. 1st Cir 1979), *writ granted* 366 So.2d 570 *aff'd,* 376 So.2d 486; *Bennett v. Hughes*, 876 So. 2d 862, 866 (La Ct. App. 4th Cir. 2004)

in the context of a sale of immovable property, such as lost profit, are not appropriate in the bond for deed context. Applying this principle to the case at bar, it is clear that Huffman's claims for remuneration based on his calculation of the tax, insurance, mortgage payments and lost profit are unwarranted under the bond for deed contract. Under applicable case law, if the debtors had met their obligations and paid the mortgage, tax and insurance payments, these amounts would be recoverable by the debtors from Huffman after the cancellation of the bond for deed was filed. Additionally, Huffman made the mortgage, insurance and tax payments after he had filed the cancellation. At that time, the obligation to pay the mortgage, taxes and insurance were Huffman's obligations, because the bond for deed was no longer contemplated. For these reasons, Huffman's claims for reduction of the amount due the debtors for lost profit, tax, insurance and mortgage payments are denied.

Huffman also asserts that closing costs paid by the debtors need not be refunded. At closing, the debtors paid settlement charges of $9,246.50.[15] In *Montz v. Theard*[16] the Louisiana state court, in considering the appropriate measure of damages after breach of an alleged bond for deed, denied the buyer a refund of "costs incurred in connection with the original sale transaction and the eviction

---

[15] Exhibit 4.
[16] 818 So.2d 181 (La. App. 1st Cir. 2002).

proceeding."[17] It stated that "the payment of those expenses did not enrich defendants; any loss with respect thereto was a result of plaintiff's own breach of the contract."[18] This court finds *Montz* to be persuasive, and accordingly will deny a refund of the buyer's closing costs of $9,246.50.

Huffman asserts that the $4,000 repair credit he credited the debtors should not be repaid the debtors. The court finds this argument to be persuasive. At the closing, the debtors were to pay Huffman a down payment of $140,000. This amount was reduced, in part, by a $4,000 repair credit Huffman allowed the debtors, in order to repair items identified in the inspection of the property.[19] At trial, counsel for the trustees stated that no repairs were made by the debtors, despite the credit being received. Because the debtors have already been permitted to reduce the amount due to Huffman once by the credit, they should not be permitted to recover this sum now as a part of their reimbursement claim. For that reason, Huffman will be permitted to reduce the amount due to the debtors on the reimbursement claims by the $4,000 repair credit.

2.  **Recoupment Claims**

Huffman asserts that he is entitled to offset compensatory damages resulting from the debtors' failure to perform the contract from damages the plaintiffs may

---

[17] *Id.* at 191-192.
[18] *Id.*
[19] Exhibit 4.

-10-

be entitled. He also asserts that under the doctrine of recoupment the plaintiffs' monetary claim is reduced by his claim arising from the same transaction.

Set off is provided for in 11 U.S.C. 553. A setoff "involves a claim of the defendant against the plaintiff which arises out of a transaction which is different from that on which the plaintiff's claim is based."[20] Section 553 prohibits the setoff of pre-petition claims against post-petition earnings.[21] Setoff generally exists where: 1) the creditor holds a claim against the debtor that arose pre-petition; 2) the creditor owes a debt to the debtor that arose pre-petition; 3) the claim and debt are mutual; and 4) the claim and debt are each valid and enforceable.[22]

Setoff is asserted to reduce or extinguish a creditor's claim against the debtor when "the mutual debt and claim contemplated are generally those arising from different transactions. . . . Recoupment, on the other hand, is the setting up of a demand arising from the same transaction as the plaintiff's claim or cause of action, strictly for the purpose of abatement or reduction of such claim."[23] Recoupment has been recognized in the bankruptcy context as an equitable doctrine which permits a creditor to reduce an obligation otherwise payable to the debtor by the

---

[20] *In re Holford*, 896 F.2d 176, 178 (5th Cir. 1990)..
[21] 11 U.S.C. 553; *In re Kosnadar*, 157 F.3d 1011, 1014 (5th Cir. 1998).
[22] 11 U.S.C. 553(a); *In re Public Serv. Co. of New Hampshire*, 884 F.2d 11, 14 (1st. Cir. 1989).
[23] *In re United States Abatement Corp.*, 79 F.3d 393, 398 n. 9 (5th Cir. 1996), *quoting* 4 *Collier on Bankruptcy*, para. 553.03.

amount of a claim the creditor has against the debtor.[24] Through the use of recoupment "a defendant [may] reduce the amount of a plaintiff's claim by asserting a claim against the plaintiff which arose out of the same transaction to arrive at a just and proper liability on the plaintiff's claim."[25] Recoupment claims work as a defense to the plaintiff's claim against the defendant.[26]

In order to sustain a recoupment claim, a defendant must show that its claim arises from the same transaction that the plaintiff has brought before the court.[27] If the defendant is able to meet the same transaction requirement, then the defendant's claim can receive preference over other creditors in a bankruptcy proceeding.[28]

Courts have refrained from providing a strict definition of the "same transaction" standard. Instead, in *In re Kosadnar*, the court noted that:

> [t]here is no general standard governing whether events are part of the same or different transactions. "[G]iven the equitable nature of the [recoupment]doctrine, courts have refrained from precisely defining the same-transaction standard, focusing instead on the facts and the equities of each case.[29]

In *Kosnadar*, the court construed separate agreements which all related to an overall compensation plan as one transaction, where the plan itself indicated that all its

---

[24] *In re Mirant*, 318 B.R. 377, 380 (Bankr N.D. Tex. 2004).
[25] *Id*. at 398.
[26] *In re Photo MechanicalServices, Inc.* 179 B.R. 604, 612 (Bankr. D. Minn 1995)
[27] *Kosadnar v. Metropolitan Life Ins. Co. (In re Kosadnar)*, 157 F.3d 1011, 1014 (5th Cir 1998)
[28] *In re United States Abatement Corp.*, 79 F.3d at 398
[29] *In re Kosadnar*, 157 F.3d 1011, 1015 (5th Cir. 1998).

components should be considered part of the same transaction, the parties stipulated that a separate agreement was a part of the compensation plan, and the equities of the case indicated that the debtor's attempts to avoid repayment were simply attempts to avoid the unfavorable aspects of his employment bargain with the creditor.[30]

The Fifth Circuit, in a series of cases, has discussed the requirements for recoupment. Recoupment is narrowly applied, and this decision is made on a case by case basis.[31] For recoupment to apply, the claims of the creditor and debtor must arise from the same transaction. Beyond this requirement, case law is unclear as to what is needed for recoupment to apply. For example, in *United States Abatement*,[32] the court noted in response to an assertion that the creditor must demonstrate that it has made an overpayment to the debtor that "the court cited no authority that substantiates this "overpayment requirement,' and we have found none."[33] Later, in *In re Kosadnar*,[34] the Fifth Circuit recognized "that there are two general requirements to characterizing a withholding as recoupment – first, some type of overpayment must have been made, and second, both the creditor's claim and the

---

[30] *Id.*
[31] *In re Mirant Corp.*, 318 B.R. 377, 381 (Bankr. N.D. Tex. 2004).
[32] 79 F.3d at 398 n. 11.
[33] *Id.*
[34] 157 F.3d 1011 (5th Cir. 1998).

amount owed to the debtor must arise from a single contract or transaction."[35]  Still later, in *In re Gasmark Ltd.*,[36] the Fifth Circuit recognized that a classic recoupment claim involves an overpayment by a buyer to a seller for goods or services, but noted that "even though an overpayment is not a required element for recoupment, the doctrine is often applied to prevent a windfall to the debtor in the overpayment context."[37]  This court concludes that recoupment may be appropriate in an overpayment context, but an overpayment is not a requirement for recoupment to apply.  That being said, case law requires that equities that are comparable to an overpayment, i.e., an injury to the creditor or benefit or enrichment to the debtor, be present prior to recognition of recoupment.[38]  This determination is made by examining the facts and equities of each case.

In the case at bar, Huffman asserts that he advanced $5,576 to the debtors representing prepaid room deposits from the bed and breakfast when the bond for deed contract was signed, and the debtors do not dispute that they received this sum. The debtors argue that this sum cannot be recouped by Huffman because it is part of a separate transaction from that of the bond for deed contract in that Huffman paid it after the contract was consummated.

---

[35] *Kodnazar*, 157 F.3d at 1014.
[36] 193 F.3d 371 (5th Cir. 1999).
[37] *Id.* at 375, quoting 5 *Collier on Bankruptcy*, para. 553.10[1].
[38] *In re Gasmark*, 193 F.3d at 375.

Huffman also asserts that $13,000 in room deposits that were advanced to the debtors by third parties, but which debtors failed to pay to him, may be recouped. Again, the debtors do not deny receiving this money, but reject Huffman's recoupment claim on the grounds that this money was the result of a transaction between themselves and third parties.

In essence Huffman asserts that he should be able to recoup the room deposit he advanced to the debtors because he was forced to honor room deposits even though the debtors failed to pay him those deposits. The room deposits represent advance revenue from the operation of the B&B. Huffman recognized that the revenue should stay with the B&B, and paid these sums to the debtors. The debtors, however, did not do the same, which required Huffman to honor the deposits, reducing revenue by giving a credit to the patrons for money he never received. Under the facts and circumstances of the case, the court finds that the room deposits are part of the same overall integrated transaction as the bond for deed for the building. The advance room deposits represent advance revenues for the bed and breakfast. When the debtors failed to make available to Huffman the advance room deposits they had already been paid, the reservations were honored by Huffman, reducing the revenue of the bed and breakfast. If not a part of the price of the property, then Huffman could have retained those revenues (as the debtors did).

In sum, the court finds that Huffman properly provided $5576 in advance deposits to the debtors, and will not permit this sum to be recouped. The $13,000 that the debtors failed to turnover to Huffman, and Huffman was forced to recognize are entitled to recoupment. The debtors retained sums to which they were not entitled, and as such, the equities favor recognition of the recoupment claim of Huffman for the $13,000 in advance room deposits the debtors failed to pay to him after the bond for deed was cancelled.

**3.   Value of Rent Between the Date of Petition and Eviction**

Huffman argues that he is owed $8,649.45 for the 42-day period between the debtors' bankruptcy filing on February 4, 2004 and the order lifting the stay to allow the debtor's eviction on March 17, 2004. The Trustees argue that since this was not raised at trial, this claim should be disallowed.

Case law provides that the debtors are required to pay reasonable rent for their use of the property "during [their] occupancy."[39]  At trial, the court received evidence, which was not objected to, that the debtors occupancy continued until eviction occurred, on or about March 18, 2004.[40] Therefore, it is appropriate that this 42-day period receive the same fair market rental value treatment that the period of

---

[39] *Gray* 503 So. 2d at 602
[40]  Additionally, the underlying bankruptcy cases 04-10703, contain orders entered on March 18, 2004 lifting the stay to permit the eviction of the debtors from the property. Pl. 32, Case No. 04-10703.

the bond for deed contract received.  The bond for deed contract had a 208-day pendency from July 10, 2003 through February 3, 2004 for which it was stipulated that the fair market rental value was $35,000.  This equates to $168.27 per day.  Applying this same per diem to the 42-day period between the bankruptcy filing and the lifting of the stay, Huffman will receive $7,067.30.

### IV.   Conclusion

This case presented some thorny issues the resolution of which was not significantly aided by either the briefs of the parties or the Louisiana jurisprudence.  Applying the principles of the Fifth Circuit cases on recoupment convinces the court that some of the recoupment claims of Huffman arise out of the same transaction and meet the Fifth Circuit test for recoupment.  The court allows the following claims in reduction of amounts owed to the plaintiffs: $35,000 in stipulated rental to the petition date; $7,067.30 in post-petition rents; $9,246.50 in buyer paid settlement charges; $1,938.66 for repairs; $4,000 repair credit and $13,000 in advance deposits, which reduce the amount of the award under the turnover complaint of the trustee to $93,809.29.  Huffman's claims are disallowed, and the trustees are owed $93,809.29 by Huffman.  All other claims

brought by Huffman to reduce this amount are disallowed.  An appropriate judgment will be entered.

    New Orleans, Louisiana, March 14, 2005.

                                              _____
                                              Jerry A. Brown
                                              U.S. Bankruptcy Judge